UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :  No. 3:18CR90(JAM)
                                :
          v.                    :
                                :
FRANKIE VEGA,                   :
                                :  New Haven, Connecticut
                    Defendant   :  September 10, 2019
                                :
- - - - - - - - - - - - - - - - x

SENTENCING

        BEFORE:

            THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

        FOR THE GOVERNMENT:

                OFFICE OF THE UNITED STATES ATTORNEY
                    450 Main Street
                    Hartford, Connecticut 06103
                BY:  BRIAN P. LEAMING, AUSA

        FOR THE DEFENDANT:

                KOFFSKY & FELSEN
                    1200 Summer Street, Suite 102A
                    Stamford, Connecticut 06905
                BY:  AUDREY A. FELSEN, ESQ.

                                    Diana Huntington, RDR, CRR
                                    Official Court Reporter

1                         **<u>10:02 A.M.</u>**

2              THE COURT:  We're here today for purposes of

3    sentencing in the matter of United States of America v.

4    Frankie Vega.

5              Appearance of counsel for government, please.

6              MR. LEAMING:  Good morning, Your Honor.  Brian

7    Leaming on behalf of the United States.

8              THE COURT:  Good morning.

9              MS. FELSEN:  Good morning, Your Honor.  Audrey

10   Felsen for Mr. Vega.

11             THE COURT:  All right.

12             Good morning, Mr. Vega.  Are you doing okay

13   today, sir?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you, by chance, have family

16   members or other supporters here?

17             THE DEFENDANT:  My sister, my brother, and my

18   cousin.

19             THE COURT:  Welcome to them as well.

20             So please be seated.

21             I believe on March 4, 2019, Mr. Vega appeared

22   before the Court for purposes of entering a plea of guilty

23   to a charge of possession with intent to distribute heroin

24   and fentanyl.  And a Presentence Report has been prepared

25   by our probation officer, Ms. Victoria Aguilar.

1           And Mr. Vega, I want to make sure you understand

2   what I'm going to kind of cover today during the

3   proceedings.

4           The first thing I have to do is go through some

5   pretty technical matters, mostly with the lawyers but a

6   little bit with you.

7           And after I'm done with that, I'll turn to

8   Ms. Felsen to make a presentation on your behalf.  I want

9   to make sure that you know that you have an opportunity,

10  of course, if you wish, to make any kind of statement

11  you'd like or if you want any of your family members or

12  supporters to say anything, they'd be welcome to do so.

13  I've received a number of letters on your behalf.

14          And then I'll hear from Mr. Leaming.

15          And then if you have anything to say in

16  response, Ms. Felsen, you're certainly welcome to respond

17  to Mr. Leaming's thoughts concerning sentencing.

18          And then I'll turn to the imposition of

19  sentence.

20          Do you understand that, sir?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  So in terms of what I've reviewed on

23  the docket, I've looked at obviously the charge in the

24  case and the parties' plea agreement, the Presentence

25  Report materials.  There was both a Presentence Report and

1    an addendum.  I don't believe any objections were filed to

2    the Presentence Report.  The parties have filed their

3    respective sentencing memoranda as well as a supplemental

4    sentencing memoranda with some letters on behalf of

5    Mr. Vega.  And of course Mr. Vega's financial statement.

6              Anything else the parties think I should have

7    reviewed?

8              MS. FELSEN:  No, Your Honor.

9              MR. LEAMING:  No, Your Honor.

10             THE COURT:  And in terms of the Presentence

11   Report, have you read the Presentence Report and also the

12   addendum to the Presentence Report, Mr. Vega?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Did you discuss it with your

15   counsel?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Does either party have any kind of

18   factual objections to what's in the Presentence Report?  I

19   didn't see any.

20             MS. FELSEN:  Your Honor, I have one minor I

21   guess I can call it an objection, but I did bring it up

22   with Probation and I talked to Brian Leaming about it.

23   And I only picked up on it after reading it for the fourth

24   or fifth time, because there were two words that were

25   missing and I think it -- having those two words in puts

1    the conduct in a little bit different context.  It's

2    Paragraph 23 of the PSR.

3                    THE COURT:  Okay.  Hold on a second.

4                          (Pause.)

5                    THE COURT:  Okay.  What's your thought there?

6                    MS. FELSEN:  Your Honor, most of the preceding

7    paragraphs talk about the other co-defendants and about

8    the investigation as a whole, and that conduct did not

9    involve directly Mr. Vega.  Paragraph 23 talks about

10   Mr. Vega's specific conduct.  And this is a little bit of

11   a different kind of case than ones I've previously been

12   involved in in which there were two separate

13   investigations going on.

14                    And Paragraph 23 covers an investigation that

15   occurred around May 2nd and 3rd into a house on Broad

16   Street in Hartford in which Mr. Vega and several other

17   individuals were arrested.  The paragraph indicates that

18   Mr. Vega was first identified as a drug distributor who

19   was operating a trap house.  He was operating out of one.

20   He wasn't running it, he wasn't directing it, he wasn't

21   managing it.  He had got arrested on the 3rd after a

22   search warrant was executed.  There were, I think, six or

23   seven or eight other individuals on the second and third

24   floor who were arrested who were charged with various

25   state offenses.  I just wanted to make sure it indicated

1    that he was operating out of that house.  He certainly was

2    there at the time, but he wasn't managing, directing, or

3    taking charge of anything related to conduct on those

4    dates.

5                THE COURT:  So you would like it to say was

6    operating out of a trap house?

7                MS. FELSEN:  Yes, Your Honor.

8                THE COURT:  Mr. Leaming?

9                MR. LEAMING:  That's fine, Your Honor.

10               THE COURT:  So I'll amend the Presentence

11   Report, direct that it be amended just to say -- I hope

12   that's clear, Ms. Aguilar.

13               THE PROBATION OFFICER:  Yes.

14               THE COURT:  In terms of just other issues, I had

15   a couple of questions based I think on the sentencing

16   memorandum submitted on Mr. Vega's behalf.  It looked like

17   with respect to the Presentence Report it gives a pretty

18   detailed description of the prior arrest and conviction

19   which Mr. Vega fled from the police and shot at the

20   police.  And the sentencing memorandum on Mr. Vega's

21   behalf gives a very different account of that episode.

22   And I'm trying to figure out if -- now, I assume that

23   there would have been an objection to the Presentence

24   Report because the Presentence Report's description of

25   that episode relates very specifically that he, in

1   Paragraph 49, that he aimed a firearm directly at one of

2   the officers pursuing him and fired a round at the

3   officer.  It looks like the -- at least, Ms. Felsen, your

4   memorandum suggests that he kind of fired into the air and

5   was not firing at the officer.  Can you maybe clarify

6   that?

7            MS. FELSEN:  I can, Your Honor.

8            I do think I referenced in my sentencing memo

9   that upon Mr. Vega's review of the Presentence

10  Investigation Report's account of incident, he takes full

11  responsibility for that night.  He was seriously under the

12  influence and can't say for sure exactly what happened.  I

13  understand that Mr. Vega pleaded guilty under the Alford

14  Doctrine to the assault in the first degree rather than

15  the attempted murder charge.  And I believe -- and

16  Probation can correct me -- that the factual recitation of

17  those incidents are pulled directly from the police

18  report.

19            THE COURT:  To the extent that the sentencing

20  memo says he fired a shot in the air to scare off an

21  officer in pursuit, there is a reference to him earlier in

22  the evening firing shots in the air, but you're not

23  disputing what the police report says, at least what's in

24  the Presentence Report?

25            MS. FELSEN:  No, I'm not.  There's really no way

1    I can.

2              THE COURT:  The sentencing memoranda on

3    Mr. Vega's behalf references an arrest in December of

4    2017.  I want to make sure I understand -- this is at

5    Page 7.  Was there an arrest of Mr. Vega in December of

6    2017?  Because I didn't see that at least recounted in the

7    Presentence Report.  I know there was an arrest with a

8    search.

9              MS. FELSEN:  I think it was a violation of

10   probation that was terminated.  I could be wrong, but

11   that's my understanding.

12             THE COURT:  Anybody have any information on

13   this?  It says explicitly he was again arrested in

14   December 2017.  Is that true or not true?  Or was there

15   simply just another court appearance?

16             MS. FELSEN:  I think a warrant issued for the

17   violation of probation.  That's my understanding of what

18   happened.  And then he was brought into court and then

19   sentencing was then scheduled for April.

20             THE COURT:  April of 2018?

21             MS. FELSEN:  Yes, Your Honor.  And then this

22   happened.

23             THE COURT:  And it got nolle'd.

24             MS. FELSEN:  Yes.  That nolle has lapsed into a

25   dismissal.

1          THE COURT:  Okay.  All right.  I think those are

2     the initial questions I had.

3          So I take it, then, there's no factual

4     objections.  If there are no other factual objections,

5     I'll adopt the Presentence Report's factual statements.

6          It looks like the Sentencing Guidelines

7     calculation from the Presentence Report is a final offense

8     level of 21 and a criminal history category of V, which

9     would correspond to a recommended range of between 70 to

10    87 months of imprisonment; a three-year term of supervised

11    release; a criminal fine range of between $15,000 all the

12    way to the maximum of $1 million; and a $100 special

13    assessment.  Does that sound right in terms of --

14          MS. FELSEN:  Yes, Your Honor.

15          MR. LEAMING:  Yes, Your Honor.

16          THE COURT:  Okay, so I'll adopt those

17    calculations as well.

18          Mr. Vega, in the federal system when a court

19    imposes sentence, if it imposes a term of imprisonment it

20    will impose a term of supervised release, sort of like

21    probation with reporting conditions.  Ordinarily, the

22    Court imposes certain mandatory conditions that wouldn't

23    be surprising to you, like not to commit another crime.

24    It imposes standard conditions under the Sentencing

25    Guidelines.  It also imposes certain special conditions.

1          And in the Presentence Report there's detailed

2    at Paragraph 89, there's three special conditions that are

3    proposed by the Probation Office.  I want to make sure,

4    Mr. Vega, that you've reviewed those, and if you have any

5    concern about those, or your counsel, to raise those.

6    One, of course, is not to communicate or otherwise

7    interact with any known member of the Latin Kings without,

8    of course, first obtaining the permission of the probation

9    officer.  A second is for participation in an educational

10   or vocational services program.  And a third is to

11   participate in inpatient or outpatient substance abuse

12   treatment.

13          And so I wanted to check with the parties about

14   that.  Do you anticipate any concerns about those

15   conditions?

16          MS. FELSEN:  I don't, Your Honor.  I've

17   discussed those with him and he understands what he would

18   have to do if he was on supervised release and those were

19   conditions that were imposed.

20          THE COURT:  Right.

21          Now, the Presentence Report also referred to I

22   think at one point, it's Paragraph 65, to his expressing

23   an interest in participating in mental health treatment as

24   a more positive alternative to dealing with stress.

25   Stress is also something that's emphasized, Ms. Felsen, in

1    your sentencing memo in terms of how he responds.  Would

2    it be appropriate to impose a mental health counseling

3    condition as well that basically makes resources available

4    so that Mr. Vega can meet with a mental health counselor?

5              MS. FELSEN:  Yes, Your Honor.

6              THE COURT:  I see Mr. Vega nodding his head.

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  I will impose that same mental

9    health condition subject to the same conditions and

10   description as to the substance abuse treatment except of

11   course for outpatient for mental health.

12             I think that's it in terms of the technical

13   matters I had to review.

14             Ms. Felsen, would you like to proceed.

15             MS. FELSEN:  Thank you, Your Honor.

16             Your Honor, Mr. Vega's matter is one of the last

17   people to be sentenced in this group of defendants.  And I

18   know that Your Honor is aware of the other individuals'

19   conduct as well as their relative culpability.  I want to

20   speak a little bit to that, but I also want to speak to

21   Mr. Vega's offense conduct before I get into who he is as

22   a person and what he's done since the commission of this

23   offense to distance himself from that and make real inner

24   changes that hopefully will lead to a productive life

25   after he has completed the incarceration portion of this

1   sentence.

2          I looked through and I've reviewed with Mr. Vega

3   the other individuals' sentencing memos and the

4   government's sentencing memos.  When I came into this

5   case, because of the other investigation that was going on

6   around the same time into Broad Street and the

7   conversations that I had with the government about drug

8   quantity and offense conduct, I was trying to figure out

9   how Mr. Vega played into the Wilson Velez conspiracy.

10          What I can say, after reading through the

11  discovery and after looking at the offense conduct

12  outlined in the other individuals' sentencing memos and in

13  the majority of the offense conduct outlined in Mr. Vega's

14  PSR, is that relatively he's less culpable than most of

15  the other individuals, many of whom were in a lower

16  guidelines range than Mr. Vega.  He was not -- even

17  though, yes, he does have a serious criminal conviction

18  for an act of violence, he wasn't involved in the April 28

19  shooting, he wasn't involved in any of the other acts of

20  violence that were alleged, he wasn't found with guns, he

21  didn't possess guns, he didn't buy guns, he didn't sell

22  guns.  And he wasn't on the wiretap for a very long time

23  or very often.  It could be Attorney Leaming would say

24  because he came in at the tail end and he was involved in

25  something else that had to do with the Broad Street

1    address.

2                THE COURT:  When he's arrested initially in May

3    of 2017, was there ammunition found?

4                MS. FELSEN:  So the police report reflects that

5    there were two different floors that they got separate

6    search warrants for because there were different

7    individuals in different undercover buys that were done at

8    each housing and then they were separated into different

9    rooms.  The police classified the rooms as A, B, C, D, E.

10   Many of the people were charged with possession -- I think

11   there were bullets that were found in a dresser in some

12   room.  I'd have to go back and check more carefully, but I

13   remember checking a couple of times to find out if there

14   was a firearm that was in close proximity to Mr. Vega, but

15   my understanding is that several of the other individuals

16   were charged with operating a drug factory, possession of

17   the ammunition, as well as sale or possession with intent

18   to sell narcotics.

19               I did look on the state judicial website to find

20   out how those cases were resolved, because all, if not

21   most, of the them were prosecuted at the state level.  A

22   couple of things stood out to me when reviewing that is

23   that all of those individuals were on probation at the

24   time as was the case with almost all of the individuals

25   who were charged in this federal case.  Some of them had

1  committed crimes or one of them at least while he was on

2  pretrial release for the federal offense.  So none of that

3  is good.

4          The most serious disposition I could find out of

5  the individuals who were prosecuted in state court related

6  to that arrest that was subject to the search warrant on

7  May 3 at Broad Street was an individual who was sentenced,

8  he was on probation, he was sentenced to 731 days in state

9  court which translates to two years and one day, it

10  triggers TS, so that means that they're eligible for

11  release before half of their sentence is served.  That was

12  all I could find from that.

13          I will say that even though Mr. Vega over 11

14  years ago was involved in that very serious offense, no

15  excuses for that, the issue here is someone who went back

16  into selling drugs to make ends meet.  He wasn't living a

17  flashy lifestyle.  He wasn't closely affiliated with these

18  individuals or involved and engaged in the violent

19  activity that's outlined in many of the co-defendants'

20  conduct.

21          Does that answer your question?

22          THE COURT:  Yes, I think so.

23          MS. FELSEN:  Thank you.

24          So relatively speaking, compared to many of the

25  other individuals, in fact most of them, his offense

1    conduct is much less serious.  And many of those

2    individuals got sentenced to a much, much shorter period

3    of incarceration than what Mr. Vega faces.

4            I wanted to get away from that and into the real

5    conduct, because you could get lost in the Sentencing

6    Guidelines sometimes, and focus on minus 2 points for

7    minor role, are these Sentencing Guidelines adequately

8    reflecting where someone should be and where is he

9    relatively speaking to the other individuals.

10           Mr. Vega got involved with distributing

11   narcotics while he was on release for distributing

12   narcotics.  And after he got arrested for doing that, he

13   got involved with and reached out to or somehow started

14   getting narcotics from Wilson Velez who was the target of

15   this conspiracy.

16           I know Your Honor knows, it's abundantly clear

17   and it's mentioned throughout the other sentencing memos

18   and I'm sure was mentioned at sentencing and I know

19   Mr. Velez has not been sentenced yet, no one needs to pile

20   on him, is that he was a prolific drug dealer who got

21   large quantities of narcotics from a relative and I think

22   from other individuals and he was known in the area to

23   deal not just with Latin Kings but with Bloods, with

24   anybody who wanted to purchase so he could make a profit.

25   He employed minors, he employed family members, he

1  employed anybody -- not just employed, but sold to people

2  so he could make a profit.  It was a for-profit business.

3          At the time Mr. Vega was struggling.  He was

4  using.  It does not excuse his conduct and I'm not

5  suggesting it does, but making bad decisions similar to

6  the bad decisions he's made in the past.  He fell into

7  this pattern of conduct where he wasn't able to succeed in

8  the way that he should have been headed and fell back into

9  getting money so he could tide himself over.  It's not

10 okay and it's serious and it warrants punishment, but it's

11 also not surprising.  I don't know how -- yes, there are

12 people, there are people who are raised in that area and

13 don't know anything else and are beaten and are abused and

14 have an absent father and a mother who is a drug addict

15 and a prostitute and abusive, there are lots of people who

16 grew up in that area who do not resort to selling drugs.

17         THE COURT:  Had he been through an inpatient

18 drug program?

19         MS. FELSEN:  He had, Your Honor.  He was

20 released from his period of incarceration, I think it was

21 Renaissance East.  It was a 30-day inpatient program.  I

22 tried to get the records; I was unable to do that.  And he

23 found it helpful.

24         People don't usually succeed the first time or

25 the second time or the third time.  I am starting to

1   change the way I think about addiction.  I've always

2   thought that it wasn't the case of if you only tried

3   harder you can do it, and I've never thought that, but

4   30-day inpatient programs are not that effective.  I just

5   haven't seen it work.  The two-year programs are

6   fantastic.  The 60-day ones are okay.  The six-month ones

7   are great.  It's very hard to get people into them.  There

8   aren't a lot of them.  Beds aren't available.  They

9   succeed not because they're doing something different but

10  they're doing it for a longer period of time.  People who

11  have ingrained ways of thinking and patterns of behavior

12  aren't able to make that change that is needed to sustain

13  it over a 30-day period and sometimes over a 60- or 90-day

14  period.

15          So I think they're great if that's all there

16  are, and sometimes that's all there are.  And I think it

17  helps people, and I think they should be available to

18  everyone.  I don't think they're worthless.

19          Mr. Vega participated in the program and he

20  benefited from the program and he's open to further

21  treatment and wants to participate in further treatment

22  and has done, to the extent that he could, participated in

23  more treatment.  But he will need it on an ongoing basis

24  for lots of reasons.  And I'll get to that -- maybe I

25  should talk about it now.

1          Mr. Vega is in a very long -- he faces a lengthy

2     sentence.  It's because of his criminal history.  It's

3     because of the seriousness of the conduct.  It's because

4     of the quantity and type of narcotic.  It's really

5     important in this case for this individual to look at what

6     he did during those five months when he was awaiting

7     sentencing in the state case and then look at his conduct

8     for the past 16 months while he was at Wyatt awaiting

9     sentencing in this case and resolution of this case to get

10    a sense of his commitment to reform, his ability to do so,

11    and his willingness to take advantage of whatever is

12    offered to him.

13          That five-month period when Mr. Vega was

14    awaiting sentencing in state court, I think -- and he can

15    speak to this more -- but what clicked for him and what

16    motivated him was the fact that a judge, someone in a

17    position of authority, was giving him a chance and letting

18    him prove himself.  And that was, as Mr. Vega has

19    expressed it, important to him and significant to him

20    because he has never had a figure like a parent or someone

21    who has had a parental or guardianship or supervisory role

22    over him see anything in him or give him any kind of sense

23    that he could do it and he was expected to do it and what

24    was expected of him.

25          So when he was out and he got the job that he

1    got, he did whatever he could, whatever shifts were

2    available.  He borrowed cars, he worked whatever hours

3    there were.  And he proved himself.  He never complained

4    about it.  And he didn't say, well, it's just Dunkin'

5    Donuts, it's just the night shift, it's just a temporary

6    position.  He made the most of it.  He was proud of it.

7    He felt a sense of accomplishment doing it.  And when he

8    was recognized at his place of employment for doing a good

9    job, it motivated him and it made him want to do more and

10   do better.

11          Right around that time his mom had passed away.

12   And that was a very emotionally significant thing for him,

13   not because his mom was an active and positive presence in

14   his life but precisely because she wasn't.  And she caused

15   so much emotional damage and so much conflict within him

16   that it was her passing that allowed him to step back and

17   take stock and see that he can't sit around and blame her

18   and he can't blame his circumstances, and he can't blame

19   anyone else but himself.  And at some point you've got to

20   stop blaming yourself and you've got to start doing

21   something.

22          He did his best.  Then this happened.  And it

23   happened because of his prior conduct that they come home

24   to roost.

25          As soon as he got arrested, he was incarcerated

1    at Wyatt, he availed himself of every program they had

2    there.  In contrast to his prior period of incarceration,

3    he has had absolutely no disciplinary infractions, he gets

4    along with everybody there.  When I say get along with

5    everybody, he has expressed to me that he's tried to

6    distance himself from a lot of the people at Wyatt.  It's

7    hard to do, because you're in there with co-defendants and

8    you're in there with a lot of people who are reconnecting

9    with neighbors and with former associates and making plans

10   for when they go somewhere else and when they meet up.  He

11   has expressed to me his desire to stay away and keep to

12   himself.  And luckily he's a quiet person, he's a private

13   person, and he has spent the majority of his life keeping

14   to himself.  He's been able to do that there.  He reads.

15   He draws.  He participates in programs.  He works.

16          And doing that for 16 months is a good sign.

17   It's someone who has the ability to keep going and to

18   continue.  And it's someone who wants to change and

19   somebody who realizes that there are resources there.

20   They're certainly better at a federal facility but they're

21   also much better on federal supervision.

22          I've talked to Mr. Vega about the RDAP program.

23   I've talked to him about Reentry Court.  Reentry Court

24   would be fantastic for him because it's an incentivized

25   program but it's also one where Mr. Vega will be around

1    people with a similar background who are done serving the

2    incarceration portion of their sentence and are focused on

3    reintegrating into society.  So he wants to do that.  He

4    will do that.  He's tried to demonstrate his ability to do

5    that and sustain it.  And those things are important

6    things and they're significant things.  A lot of

7    defendants do that and they come before Your Honor for

8    sentencing because they've done those things because

9    they're captive audiences at Wyatt and maybe there's not

10   much else to do.

11          But from where he came and from what he's done

12   in the past, if you look at an almost two-year period,

13   he's done really good.  And that's something that needs to

14   be balanced against the bad, because there's certainly

15   bad.  And it needs to be factored into sentencing because

16   sentencing is not just about incarceration; it's about

17   reintegration, it's about reform.  There are plenty of

18   ways to punish people while they're on supervision by

19   restricting their liberty, and certainly those

20   restrictions can be imposed.

21          If Your Honor has any questions, I can certainly

22   talk to anything.  I know that he prepared a statement.  I

23   don't think he feels comfortable reading it, but I don't

24   know.  I don't want to step on his toes.  But I know that

25   it's hard for him, it takes a while for him to open up.

1    But when he does, it's thoughtful and it's sincere.

2              And I think if I can have a moment.

3              THE COURT:  Certainly.  Of course.

4                   (Pause.)

5              THE COURT:  Maybe, sir, you could come on up to

6    the lectern, if you could, up front.

7              THE DEFENDANT:  Your Honor, all my life I've

8    been making excuses for my bad decisions.

9              I grew up in a very abusive home where I was

10   forced to take responsibility for my siblings at a very

11   young age, so I blamed growing up in those circumstances

12   for my bad decisions.  Then I blamed my mother's drug

13   addiction for my bad decisions.  I also blamed my own drug

14   and alcohol abuse for my bad decisions.

15             What I learned, Your Honor, is that I should

16   have learned from all these circumstances and not blamed

17   them for it, for my bad decisions.

18             It was a long and stressful ride up until my

19   mom's death.  It took for my mom to die for me to

20   understand that I seriously need to change if I want to

21   better my life.  It took for her to die for me to

22   understand that I'm doing the same thing to other people

23   in my community.  I started to think about all the kids

24   out there in the community that are going through the same

25   circumstances that I blamed most of my life on, my bad

1    decisions.

2           The neglect and abuse I caused them by selling

3    drugs to their parents or family members and for all I

4    did, I'm truly sorry for, Your Honor.  I wish I could take

5    these things back, but I can't.  I wish I could have

6    realized what I did to people earlier in my life, but I

7    didn't.

8           All I can tell you is that I'm seriously trying

9    to change and better my life, and I'm using this

10   incarceration to my full advantage.  I am currently in the

11   workers program and I take drug abuse educational

12   programs.  And I also attend religious services.  I will

13   do the same when I get out by taking full advantage of

14   what Probation has to offer.  I will seek employment and

15   try my best, my hardest to become a good role model for my

16   nephews who need a father figure in their life too.  I

17   will better myself so that I can provide for my family and

18   not have to go through this ordeal again.  I will not make

19   excuses no more.  I take full responsibility for my

20   actions.  Sorry for wasting your time.  Thank you.

21              THE COURT:  Thank you.

22           Tell me a little bit about, what is going to be

23   your plan in terms of your substance abuse?

24              THE DEFENDANT:  I think I should further educate

25   myself taking drug abuse programs.  And try to take

```
 1    advantage of Probation, all the programs that they have to
 2    offer.  Try to stay clean.  Just focus myself on working
 3    and more time with my family instead of the streets.
 4            THE COURT:  So what would be your plans in terms
 5    of working?
 6            THE DEFENDANT:  Right now, the lady that I was
 7    working for at Dunkin' Donuts, she's willing to hire me
 8    right now, but I just -- I'll work anywhere right now.
 9    Wherever I can get on job, I'll work.  Just try to stay
10    out of trouble.
11            THE COURT:  What would you like to do for
12    long-range work?
13            THE DEFENDANT:  I like art.  But I don't know.
14    I'll find a trade.  Something like probably culinary arts
15    or something.
16            THE COURT:  So help me understand a little bit
17    why -- what's going through your mind.  You came out of
18    jail a long time.  And you're back.  And the police come
19    to Broad Street, do the search, and they find everything,
20    and you're arrested all again.  And then even then some
21    months later you're on the phone with Mr. Velez and you're
22    doing more drugs.  Really the worst kind of drugs, right?
23    Heroin and the fentanyl, stuff that's killing people.
24    What are you thinking at that point?
25            THE DEFENDANT:  I think to me it was that I was
```

1    already addicted to it myself, so I was just caught up.  I

2    didn't know how to stop.

3              THE COURT:  The Presentence Report talks about

4    you're taking Percocets.  Was there more than that?  I got

5    another letter from someone else saying you were actually

6    doing heroin.  I'm sure you would have corrected that in

7    the Presentence Report if --

8              THE DEFENDANT:  I couldn't afford Percocets no

9    more so I started using heroin which is almost the same

10   thing.  And it was cheaper.

11             THE COURT:  I see.

12             Are you getting an understanding of how

13   important it is, you have to actually deal with the

14   substance that basically hijacks you, you know that?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  It sounds like your whole episode

17   with the shooting at the police had a lot to do with you

18   taking stuff that just made you not think at all.

19             THE DEFENDANT:  Yes.

20             THE COURT:  What's going to be your approach to

21   the next Velez in your life?  Basically, you're going to

22   come out and you're going to have another Velez, it's

23   going to be the Latin Kings, it's going to be some gang

24   like that.  What is going to persuade you that the Latin

25   Kings are not good for you?

1          THE DEFENDANT:  I think I'm getting too old for

2    the streets.  I don't got time for none of that.  I just

3    want to stay home, stay away, stay with my family.

4          THE COURT:  Are the Latin Kings some sort of

5    family?  I haven't quite figured that out why people come

6    in and -- why this allegiance to the Latin Kings as

7    opposed to actual family members or that young child that

8    you see sitting in the audience there.

9          THE DEFENDANT:  I don't know.  I don't

10   understand.

11          THE COURT:  Are the Latin Kings a good

12   organization that does things that are good and helpful

13   for people?

14          THE DEFENDANT:  Definitely not.

15          THE COURT:  So when you're out, I'm going to

16   have a condition that says you can't associate with

17   members of the Latin Kings unless there's some special

18   circumstance for which you can tell your probation

19   officer.  Do you intend to comply with that or are you

20   just going to go back to talking to the Latin Kings?

21          THE DEFENDANT:  I intend do everything Probation

22   asks.  Whatever it is they tell me to stop doing it, I'm

23   not going to do it.  I really don't want to do it anyways.

24   Like the last five months before I came to jail, I wasn't

25   associating myself with anybody.  I was just staying with

1    my family, going to work and coming home.

2            THE COURT:  So tell me, why did things change in

3    the last five months?

4            THE DEFENDANT:  When the judge -- I thought --

5    during that whole time I was out on bond, I thought I was

6    going back to jail.  So I started really not caring.  Like

7    in my head I was about to go to jail soon so I just got

8    caught up in the moment.  Once the judge gave me a chance,

9    I just decided to stop with them.  My sister was helping

10   me, getting me away from drugs.

11           THE COURT:  Is there anything else you want me

12   to know?

13           THE DEFENDANT:  I just want you to know that I

14   want to change.  That's it.

15           THE COURT:  Thank you, sir.

16           THE DEFENDANT:  Thank you.

17           THE COURT:  Ms. Felsen, is there anybody else

18   you want me to hear from?

19           MS. FELSEN:  Your Honor, they're just as quiet

20   as Mr. Velez.  But what they have said to me is heartfelt.

21   They've struggled themselves.  They're not financially

22   well off.  His sister now is working at Burger King.  They

23   take whatever kind of job they can find and do what they

24   can to support each other and their family.  And they will

25   continue to do that for Mr. Vega.  They're going to stay

1    far away from Mr. Velez.

2            They have seen what Mr. Vega's association with

3    Mr. Velez and others have done to other people in the

4    streets.  They've seen what it's done to him.  They've

5    seen what it's done to their family.  And even though they

6    love him and support him, they have made clear to him that

7    if he's coming home and he's living with them and they're

8    helping him get a job and get on his feet, that he needs

9    to avail himself of whatever he can in terms of resources.

10   And there are resources there.  There's resources that can

11   be provided for him inside, in prison, or outside.  And

12   the inside prison is for, for the most part, it's for

13   incapacitation.  It doesn't promote change and it doesn't

14   help somebody reacclimate and reintegrate.  And right now,

15   given where Mr. Vega is in his head and with his

16   demonstrated conduct, it's in the interest of justice to

17   help him look forward.

18           If you have any questions, I'm happy to answer

19   them.

20           THE COURT:  Thank you very much.

21           MS. FELSEN:  Thank you.

22           THE COURT:  Mr. Leaming.

23           MR. LEAMING:  Thank you, Your Honor.

24           I'll start where Attorney Felsen started, which

25   is sort of the offense conduct that brings us here today.

1           In a lot of respects, maybe Mr. Vega doesn't

2    know, he got a little bit of a break in this case.  Not in

3    part of the plea agreement, but in the way that the

4    investigation evolved.  It really wasn't two separate

5    cases in which he sort of got caught up in.  The actual

6    investigations started in 2016 targeting a local street

7    gang that had been responsible for a number of shootings,

8    a murder, and a particular location of the city.  During

9    the wiretap phase of that investigation there was a member

10   of the Latin Kings who had been -- not Mr. Vega, but

11   another one who had been identified as one of the heroin

12   sources for this local street gang.

13          Because that group had been responsible and had

14   been involved in so much violence, the investigation

15   continued into the Latin Kings source.  The wiretap

16   continued but it was walled off and this other

17   geographically based gang was arrested.  That case

18   actually ended up in front of Judge Hall.

19          Meanwhile, the investigation regarding the

20   Latin Kings continued to develop.  And through the course

21   of that investigation, it appeared that a lot of the

22   street-level drug activity was occurring at this address

23   on Broad Street.  Mr. Vega was identified during the

24   wiretap phase of the investigation, but during that part

25   of the investigation the events of April 28th happened

1    involving Mr. Velez and the drug-related shooting on

2    Franklin Avenue.

3           Meanwhile, the FBI had developed another source

4    that had a direct relationship with Mr. Velez.  And a

5    decision was made to focus on Mr. Velez because he was

6    known at the time and there was really no dispute that he

7    was a state regional officer for the Latin Kings and he

8    was a more significant target for the FBI.  And so a

9    decision was made as to not make federal arrests of the

10   Broad Street crew.

11          And a decision was made, however, that we had

12   probable cause based on the wiretap, but we didn't want to

13   use the wiretap to further the probable cause to expose

14   the existence of that.  So they started doing control

15   purchases, some of which are described here involving

16   Mr. Vega.  There was a lot of surveillance conducted at

17   that location.  There really was a scourge in the

18   neighborhood.  Both the second and third floors were being

19   used -- I'm not even sure if there's anything on the first

20   floor -- were being used as a distribution point.  As

21   evidenced by the description in the PSR, when the FBI who

22   is now assisting Hartford police did the search warrants,

23   there was narcotics throughout both the second floors.  As

24   Attorney Felsen described, there were multiple people, but

25   that was no surprise to the investigation about what was

1     going on at that location.

2             Unfortunately -- and I don't like to disparage

3     my state counterparts -- but Attorney Felsen is right, a

4     lot of people got arrested on state charges, got a lot

5     lighter of a sentence I think than they would have gotten

6     if they were charged with the federal offenses.  And then

7     all the evidence from the wiretap was then presented.

8             At that point, the focus again became on

9     Mr. Velez.  And soon after April 2017, the FBI began

10    focusing its efforts to try to get on Mr. Velez's phone

11    which ultimately they were able to do beginning in August

12    of 2017.

13            THE COURT:  Did Mr. Velez have a connection to

14    the Broad Street address?

15            MR. LEAMING:  We hadn't made that connection

16    from the phones, but we were also missing a piece of it.

17    We knew that the phone that we were on, an individual who

18    was using it, again, as the Court knows, fairly

19    systematic, predicably was dropping phones, picking up new

20    phones.

21            And then when this other source became available

22    who had a direct relationship to Mr. Velez, that seemed to

23    be the more prudent thing as opposed to sort of chasing

24    the phones around to try to find out if there was a direct

25    connection.

1          So at that point in time the intel was that

2    Mr. Velez was increasing his drug presence in various

3    Latin King neighborhoods in Hartford, but we hadn't made a

4    direct connection between Mr. Velez and the phones that

5    were associated with Broad Street.  Now, we weren't on

6    Mr. Vega's phone; we were on another Latin King phone.

7          So by August -- so the arrests are happening.

8    All the individuals are arrested on state charges.  And we

9    sort of decided that we're just going to let the state

10   cases sort of play themselves out and depending on what

11   happened on the Velez investigation and the timing of

12   that.

13          So on the Velez investigation -- and I'm not

14   sure we've talked about it that much in some of the other

15   sentencing hearings, but the first phone that we're on of

16   Mr. Velez's was his Latin King phone where he's only

17   talking to other high-ranking Latin King members.

18   Massachusetts, they talk about Chicago, other people in

19   Connecticut, and it's sort of just about problems they're

20   having.  Terminating people from the gang, that kind of

21   stuff.  There's some drug activity, but it's clear, based

22   upon the controlled buys, that there's another phone.

23          So after the first 30 days, the wiretap

24   continues on the Latin King phone but then goes onto the

25   drug phone.  Predicably, we discover that that was his

1    primary drug phone, it appeared that he was getting large

2    quantities of narcotics from a cousin.  But as sometimes

3    these things go, the cousin gets alerted to the fact,

4    actually incorrectly, that there was another investigation

5    that brings in new Latin Kings in New Britain.  That

6    caused them all to be suspicious and it caused Mr. Velez

7    to communicate with all of his associates to say drop your

8    phone, the feds are on us, we've got to switch things up.

9          We probably only had about eight good days on

10   that phone before he started transitioning everybody off

11   of the phone.  So that takes a little bit of time, but the

12   content is he doesn't want to talk on the phone anymore,

13   he just wants to meet everybody.  In those meetings,

14   including the confidential source, he says, "Yeah, I'm

15   going to get a new phone.  You need to get a new phone.

16   And then we can resume our activity."

17         Mr. Velez kept dropping phones.  So we got

18   authority for a roving wiretap I believe in October.  And

19   roving wiretaps, you know, are very difficult to get.  And

20   you think they're going to be really good when you get

21   one.  But the practical matter is when someone keeps

22   dropping your phone, while we have the authority to keep

23   intercepting those phones, we still have to identify those

24   phones.  In the course of 30 days, Mr. Velez went through

25   four phones.  So in total -- and then there were lots of

1    days where we had no intercepts because he dropped his

2    phone and switched to another phone.

3            So what happened is over the course of the

4    30-day roving wiretap, we probably only had half of that

5    of actual intercepts on a phone being used by Mr. Velez.

6    But the significance as relates to Mr. Vega is he's picked

7    up on it.  Not a lot.  But we don't have a lot of

8    intercepts of anybody on any of the phones because he

9    rarely had the phones for very long.

10           From the government's perspective, Your Honor,

11   it's a game changer for me because he's on release for the

12   May arrest.  And we know he was associating with

13   Latin Kings, we knew his history was as a member of the

14   Latin Kings, and now he's on the phone with the Hartford

15   leader of the Latin Kings.

16           And so when the decision is made to ultimately

17   arrest all of the people associated with the Velez wire,

18   Mr. Vega gets caught up on that where most, if not all, of

19   the Broad Street people, either their cases had resolved

20   or were still pending, but we couldn't -- it was too

21   complicated to sort of merge the two wires.  They really

22   were not -- they would likely be two conspiracies because

23   Mr. Vega, the other individuals weren't on Mr. Velez's

24   phone.  Mr. Vega was on Mr. Velez's phone.  So we're all

25   here for that.

1           And while it may seem that comparison-wise

2   Mr. Vega doesn't compare to some of the others in the

3   Velez case, he was definitely more closely associated with

4   the Broad Street crew.  But in our experience, that's not

5   unusual.  After the Velez case, the FBI transitioned to

6   another Latin King who was also a leader but had been

7   feuding with Mr. Velez and had sort of broken off.  That

8   case resulted in another wiretap.  That case is pending

9   before Judge Bryant now.

10           But our experience and as our investigation has

11  revealed, that's not unusual in Hartford.  There are

12  Latin Kings and they all subscribe to the Connecticut

13  chapter.  It doesn't stop them from having often personal

14  disputes, but nevertheless still subscribe to some of the

15  principles of the Latin Kings.  And still, the bottom line

16  is that they're a criminal organization and that they

17  function typically by having strength in numbers, by being

18  able to go into certain neighbors and sell drugs without

19  interruption.

20           As the Court will recall what happens on the

21  April 28th thing, you had a young man who goes to a

22  neighborhood who is not a Latin King and decides he wants

23  to sell drugs there.  If you're not a Latin King, that's a

24  problem for him, as the events of April 28 showed.

25           But what you see on Broad Street is what you

1    see.  Whether they're on Bond Street, which is another hot

2    bed for Latin Kings, or Madison Street, which is another

3    Latin King neighborhood, those are the areas that the crew

4    and the gang can operate freely with their criminal

5    activity and there's strength in numbers.  Just as what

6    happened on Broad Street, there's seven or eight of them

7    selling their drugs out of there.  They may act more as

8    independent contractors, they may share sources of supply,

9    but they're looking to generate their own money from

10   whatever they sell.

11          And that's what Mr. Vega is.  He's obviously not

12   Wilson Velez.  He's not some major source of supply.

13   There was a substantial amount of heroin, fentanyl, other

14   drugs, packaging material.  There was six rounds of

15   ammunition in a dresser drawer.  There were all of the

16   things that you would see from street-level distribution.

17   And I think it would be fair to say that's what Mr. Vega

18   is, he's a street-level distributor.

19          So what does make his conduct sort of more

20   serious or more concerning is that we have a history here

21   of his continued association with a street gang that by

22   its very existence creates a higher risk of danger and

23   violence.  Because we've seen it.  We've seen it in

24   connection with this case.  We saw it the subsequent case.

25   There was a lot of street violence created between the two

1   Latin King factions where they were shooting at each other

2   because of this ongoing dispute.  As often happens, even

3   when they're supposedly the enemy of the perpetrator, they

4   still won't talk about it.  They won't talk to law

5   enforcement certainly.  They may talk to each other about

6   it, but it sort of underscores what the street gangs could

7   do to a community.

8           And if you live in these neighborhood, you know,

9   if I walk over there, you know, I know all those kids

10  hanging out there are Latin Kings.  I don't want to be

11  anywhere near them, because if they're feuding with some

12  other Latin Kings or some other street gang, it's not a

13  good place for me to be.

14          I think the problem, from my perspective, of

15  what we see of Mr. Vega is his propensity to reassociate.

16  You know, it's not uncommon for people to go through

17  treatment and to fail once, twice, three times.  You know,

18  I've been going to compliance review and violation

19  hearings for 15 years and it's not uncommon that this

20  happens.  Oftentimes we're in because they tested positive

21  or dropped out of treatment and they're looking for a more

22  suitable treatment, or maybe there's a mental health

23  component that hasn't been addressed.

24          But Mr. Vega goes back.  He doesn't just start

25  using drugs.  He goes back to the Latin Kings and he

1     starts selling drugs again.  And I hear Mr. Vega says, and

2     it doesn't surprise me what he said, is I stopped caring.

3     I was going to go to jail, something bad was going to

4     happen, and so I didn't care.  Even though he saw

5     firsthand what heroin and fentanyl did to his own family.

6            And I believed him when I heard him say that for

7     a long time he blamed his mother for his own conduct, at

8     least partially about his own conduct, because of her --

9     what her drug use did to their family and to him, in

10    particular.  But that tells me that that sort of disregard

11    for human life because I'm going to go out and do exactly

12    what I know is killing my own mother and sell it to

13    somebody else's mother, because ultimately that's what

14    you're doing.

15           In 2017 we had over 1,000 overdose deaths in

16    Connecticut.  That's sort of a number that, okay, I try to

17    put it in perspective, right?

18           For a long period of time we did a lot of

19    outreach at the high schools.  And I would go to the high

20    schools.  The first thing I'd ask the principal or whoever

21    the administrator is, how many students do you have here?

22    It's not uncommon to say, "We have 1000, 1200."  And then

23    the kids would all come in and fill this auditorium.  And

24    I would say, "Imagine that everybody here dead."  Imagine

25    the fact that not only is it killing a thousand people,

1    but to put it in perspective, that's more than suicide,

2    intentional suicide, homicide, and motor vehicle accidents

3    combined.  And so that's a big number, right?  And

4    everybody who is out there selling it has got to own it

5    now.  Because you can't like pretend it's not out there or

6    you can't pretend you don't know about it.  The fact that

7    his mother was found overdosed, you know, Hartford is

8    going to break the record again this year.  We're

9    expecting more overdose deaths in Connecticut than they've

10   ever had before.  It's not going away.  We can't assume

11   that it's not that bad because someone else is going to do

12   it if I don't do it.  You know, I don't care.  Well, now

13   you have to care and you have to take ownership for the

14   responsibility and your contribution to the problem.

15           So with respect to Mr. Vega, I think of him

16   like, yeah, he's had 16 months of sobriety, his head is

17   probably at a better place than it's probably ever been.

18   But I got to think that I thought his head would have been

19   pretty good when he came out in 2016 when he came out of

20   treatment after spending seven years in prison for a very

21   serious crime and that, well, state probation may not have

22   the resources that the federal probation has.  You would

23   think that, you know, no matter what, we all know today

24   that whatever sentence Your Honor imposes, that Mr. Vega

25   is going to come out and he's going to stumble and he's

1    going to struggle.  And he may violate because he may use

2    drugs again.  He may knowingly associate with the Latin

3    Kings.  And then what's he going to think?  The same thing

4    he thought in 2017:  "I'm going back to jail so I don't

5    care.  I don't care.  I'm going back to jail, I'm going to

6    do whatever I want."  And that's the danger that someone

7    of that mindset presents to the community.

8              And while it's easy to see that's not what he

9    wants to do, and I have no doubt he doesn't want to do

10   those things as he stands before Your Honor, but the fact

11   of the matter is we know that those things will face him

12   and that he's going to be confronted with those struggles.

13   And what reasonable assurance do we have that he won't

14   take the path that he's always taken?  Which he's going to

15   go down to Broad Street or Madison Street, two places that

16   he had already been associated with, two places where he

17   knows the people, the people that even though they're

18   members of a criminal organization are people that at some

19   level will care about him, and he is going to fall down

20   that slippery slope and go right back to what he's been

21   doing.

22             Ultimately, every sentencing is a calculated

23   risk.  We're trying to project what will happen.  But here

24   we've not to still first focus on what's the just

25   punishment.  There's got to be just punishment for what he

1    did.  Because he knows what he did was serious and he

2    knows that that carries consequences and a significant

3    sentence.

4           And we've got to know that there is a

5    significant component about protecting the community.  And

6    while we can all credit his words today, we have to still

7    look at his behavior before.  We're not taking eight years

8    ago; we're talking 2016.  He was arrested in 2017, and

9    then he got charged again in 2018 but based on conduct

10   that happened in November of 2017.  So that's a pretty

11   good predictor that he does present a danger to the

12   community.

13          Ultimately, Your Honor, I think with respect to

14   Mr. Vega is it's going to be a long hall for him.  And I

15   know we talk about we can do all sorts of things on

16   supervision that could be there so if he violates we can

17   sentence him back to prison.  As a practical matter, that

18   doesn't really happen.  Supervision isn't about waiting

19   for somebody to trip up so we can send him back to prison.

20          Years ago I was state prosecutor in a far away

21   state.  When we had a weak case, and we had sentencing

22   guidelines in the state, and the judges then, all

23   pre-Booker, had more discretion under the state

24   guidelines, we would let them out on some supervision,

25   probation, or whatever.  Because a lot of times I could

1   predict this person won't make it 30 days, 60 days.

2   They're going to stumble and then the judge is going to be

3   able to do whatever the judge is able to do.  There if

4   they failed to report in a timely way, if they didn't call

5   probation officer, they'd be back in a hearing and the

6   judge would sentence to the maximum.  That is gone.  They

7   don't even do that there anymore, according to my old

8   colleagues.  That philosophy is gone.  The point of

9   supervision is to help the person, to get them into the

10   community.  It's not as soon as they stumble, send them

11   back to prison.  The only ones going back to prison are

12   the ones committing new crimes.

13          While I agree all of those things are going to

14   need to be in place and I'm sure will be in place for

15   Mr. Vega, but it's not a substitute for what the

16   appropriate sentence is, at least in my view, Your Honor.

17          For those reasons, I ask for a mid-point in the

18   range.  He's done a lengthy prison term.  He had

19   opportunities to change.  He stumbled not just by using

20   drugs but by going back to the same conduct, by making

21   those same associations.  For all those reasons,

22   Your Honor, the government does believe a sentence of 78

23   months is appropriate.

24          THE COURT:  Thank you.

25          I know the range, of course, is based upon the

1    parties' agreement there's at least 43 grams of fentanyl

2    involved here.  Is that based upon essentially the

3    quantities involved with respect to both the May -- the

4    controlled purchases in May of 2017 and then the later on

5    the wire transactions from November?

6              MR. LEAMING:  The quantity is based on the

7    controlled buys, the amount that was seized from the

8    search warrant, and the intercepted phone calls on the

9    Velez phone.

10             THE COURT:  Okay.

11             MR. LEAMING:  Just that.

12             THE COURT:  And how much longer, remind me how

13   much longer did the interceptions occur on the Velez

14   phone?  I'm trying to figure out, I know there's no

15   evidence of his continued drug dealing after

16   November 2017.  I'm trying to figure out if that's

17   something that the government would have detected if that

18   had been going on into 2018.

19             MR. LEAMING:  So we ended pretty quickly because

20   we executed the search warrants in early December at

21   Mr. Velez's stash house on Hamilton Street.

22             THE COURT:  That helps.  Thank you.

23             Ms. Felsen, anything?

24             MS. FELSEN:  I do want to address a couple of

25   things that Attorney Leaming said about what seems to be

1    the inevitability of Mr. Vega's stumbling or falling or

2    failing or not doing okay.  That's likely to happen.  It's

3    likely to happen.  But that's not why you incarcerate

4    people.  You have to anticipate a time when somebody's

5    going to be released, when they're going to be

6    participating in the things in the community that they're

7    supposed to with supervision, with help, with assistance,

8    but also with restrictions.  And with a loss of liberty.

9    And with things that constitute punishment.

10            Understand completely it's a serious offense.

11   Nobody is stating it's not.  And if we're talking about

12   punishment and we look at what the other individuals in

13   this case have gotten, the ones who were almost all

14   charged with shooting at people, with buying and selling

15   guns, with pistol-whipping people, in fact most of those

16   plea agreements involve just gun charges and don't even

17   take into consideration the drug sales which encompassed

18   the entirety of the investigation.

19            If we're looking at relative culpability and

20   we're looking at what Mr. Vega has done to show that he

21   wants the help and he needs the help and he is

22   progressing, if we look at all of that and we balance all

23   of that and we take into consideration the purposes of

24   sentencing, the kind of sentence that this warrants is one

25   that focuses on supervision and looks at where he stands

1    relative to everyone else.  I looked at everyone's else's

2    sentence.  My recommendation, my suggestion was that he

3    was closer in terms of criminal -- if you balance all --

4    nobody has the same criminal history, no one has the same

5    conduct, and no one has the same offense conduct in this

6    case just because of the shootings and because of the

7    lenth of Mr. Velez's association with many of these

8    individuals.  But he seems to be more closely situated in

9    terms of offense conduct with Miguel Martinez and Mario

10   Mercado, so that's like a 24-month sentence, a 36-month

11   sentence.  Even if he were towards the high end of that,

12   taking into consideration the seriousness of the

13   conviction that was over 11 years ago, that kind of

14   sentence will still allow Mr. Vega to participate in the

15   RDAP program, and it gives a lot of wiggle room for him to

16   be transferred from Wyatt to another facility, for him to

17   be classified for him to finish up the program before he

18   is in a halfway house.  I think with the RDAP you can even

19   do four months of it at a halfway house.  But it also

20   punishes him for all of his conduct.  It was all taken

21   into consideration by the plea agreement.  It was all

22   factored into the guidelines range.

23           I know that Attorney Leaming has talked about

24   state cases and about this opioid epidemic.  I'm in state

25   court more than I'm in federal court.  I was in state

1    court two weeks ago in Norwalk, two separate cases.  One

2    was with my next door neighbor who I watched grow up from

3    a girl to a college student at University of Delaware to

4    my dog sitter to my baby sitter to getting a master's

5    degree while interning at an inpatient program.  She

6    happened to fall in with someone at the inpatient program,

7    she started using drugs, she became addicted to heroin,

8    and she was in court as my client because she stole over

9    $20,000 in a Rolex watch and other things from the house

10   she was nannying at which I probably gave her a

11   recommendation for.  So that case was going on.

12          At the same time, another client of mine who

13   grew up in Bridgeport, had nothing to speak of, had worked

14   for 14 years at the same shoe store, and was low-hanging

15   fruit, and he was selling heroin, and then when they

16   executed a warrant he had heroin on him.  And the things

17   that we were talking about with both of those cases is we

18   were looking at this incredible -- this deathly horrible

19   epidemic that we experience and we're looking at these

20   people in state court like these people on Broad Street

21   who are charged in state court, who you're not just

22   getting them and it wasn't the most unlucky day of their

23   life and it was the first time they were ever selling

24   narcotics and the police just happened to fall upon them

25   and they got caught selling drugs and it's aberrant

1    conduct.  But they get granted programs.  They get given

2    resources.  Their conduct and my client's conduct in that

3    state case was very similar to Mr. Vega's conduct.  And he

4    doesn't deserve a program, doesn't warrant a program in

5    this, and this is a federal prosecution.  And it warrants

6    a term of incarceration, but it also warrants helping

7    Mr. Vega for, as when Mr. Leaming says, he's going to

8    stumble, for providing resources that Mr. Leaming

9    acknowledges are necessary and appropriate.  And

10   recognizing what he's done and the efforts he's made, not

11   just while incarcerated but while he was out and given a

12   chance and something more was expected of him.  That's not

13   just benefiting Mr. Vega; that's benefiting the community.

14   That's benefiting people like my neighbor who is getting

15   treatment right now who bought the drugs from somebody

16   that might be like Mr. Vega.  That benefits everybody.

17   That benefits the person who gets their brakes fixed by

18   somebody who might have a drug problem.  That benefits

19   somebody who might come across Mr. Vega while he's

20   rehabilitated and be able to avail themselves of services

21   that he may have to offer.

22          We can't just incarcerate people and

23   incapacitate them because we expect them to stumble,

24   because we expect them to fail.

25          Everybody who is charge in this case, except for

1    one, the person who was released and while he was on

2    pretrial release committed another crime, everyone had a

3    criminal history, everyone had been in and out of prison.

4    It's no shocker that they were all living in the same area

5    in Hartford and doing the same things.  It's not

6    coincidence.  It's not happenstance.  It's unfortunately

7    history.  And the only way to keep it from repeating

8    itself is to try a little better, to do a little

9    different.  It doesn't mean you cut him a break; you just

10   give Mr. Vega a sentence that makes sense that's in the

11   interest of justice and that balances everything, not just

12   the guidelines range which here is so much higher than

13   every other individual except for the individual who is

14   charged with distributing narcotics over a long period of

15   time and doing many, many, many other things that put him

16   in a much more serious category.

17            THE COURT:  Is there something about the

18   guidelines range here that's based basically upon

19   Mr. Vega's decision to traffic not just heroin but

20   fentanyl, major killers, basically, is there something

21   about the guidelines range that you say is, well, gosh,

22   that's just inappropriate, if you're selling complete

23   poison that is killing more than a thousand people a year

24   in Connecticut, that guidelines range, that's just too

25   harsh?

1          MS. FELSEN:  It is complete poison and the

2    guidelines range is the guidelines range for that

3    particular drug for a reason.  I have not had a case here

4    in the past four or five years that has involved heroin

5    that hasn't also been mixed with fentanyl.  That doesn't

6    make it okay, but that unfortunately is just what's

7    available.  Even in the one case I thought I had that was

8    just heroin where on the wire people were saying it's just

9    heroin, "I don't want anything in on this, I don't want

10   any of that stuff," unfortunately with the testing it

11   proved that there was in fact fentanyl cut in it.  It is

12   deadly and it is serious.  And the guidelines range

13   corresponds to that.

14          However, that needs to be balanced with all of

15   the other factors.  And part of that balancing and part of

16   the sentencing analysis has to look at everybody else in

17   this case and the relative conduct.

18          THE COURT:  Okay.  Thank you.

19          Anything else?

20          MS. FELSEN:  No, Your Honor.  The only thing

21   I'll say is if Your Honor is strongly considering the

22   guidelines range and whether there's a reason for the

23   guidelines range to be any different if we're just looking

24   at his relative culpability and the other individuals

25   charged in this, he's not a minimal participant, but he

1    certainly falls into the category of a minor participant.

2             THE COURT:  Well, his guidelines range with

3    respect to the narcotics dealing, it's based upon

4    particular transactions that he engaged in in which he was

5    primarily involved, right?  Mr. Mercado wasn't part of

6    that, his fentanyl transactions, for example.  So to the

7    extent that the sentence calculation here is based on

8    that, it's not because he was a minimal participant in

9    what was occurring or a minor participant.  These drug

10   transactions were ones that he was personally involved

11   with.

12            MS. FELSEN:  They are ones that he was

13   personally involved with as well as the search executed on

14   Broad Street on May 3rd.

15            THE COURT:  So I guess I'm not quite

16   understanding the argument that somehow he's minor or

17   minimal.

18            MS. FELSEN:  He's minor in the sense,

19   Your Honor, that he wasn't involved -- you look at the

20   factors that you consider, the length of time, the other

21   individuals, the role you play in that.  He's certainly

22   not minimal in the sense that he wasn't just storing it.

23   He wasn't just doing other things that are associated with

24   a minimal participant, but relative to the other people

25   and the length of time and the amount of transactions and

1    his actual offense conduct, if Your Honor is considering

2    the guidelines and asking whether or not that range

3    reflects where it should be, that would be my comment

4    about them.

5              THE COURT:  All right.  Thank you.

6              I'm going to turn to the imposition of sentence

7    at this time.

8              Mr. Vega, I want to talk to you a bit about what

9    it is I've considered, what the law requires that I

10   consider any time that I would impose a sentence.

11             First thing, of course, I have to think about

12   what it is you did wrong that brings you into court and

13   unfortunately what's happened on other occasions.

14             I also have to think about everything else in

15   terms of the challenges that you've had in your life, your

16   growing up, your family, and the family support that you

17   have.

18             I have to think about what are the purposes of a

19   criminal sentence.  You've heard the attorneys talk about

20   that today.  What's a just punishment, what will promote

21   respect for the law, what reflects the seriousness of

22   doing something like selling this kind of substances that

23   you were, discouraging or deterring not just you but

24   others, as well as helping you put things right in terms

25   of your future for rehabilitation.

1           I also have that think about what the Sentencing

2      Guidelines say here.  The Sentencing Guidelines are the

3      considered judgment of an expert commission that's been

4      appointed through law in terms of what's an appropriate

5      sentence so I have to give that consideration.

6           I have to think about the need to avoid

7      unwarranted differences in the sentence you would receive

8      and the sentence that somebody else in similar

9      circumstances to you would receive.

10          Basically, I've got to think about everything

11     that I know and that I've learned about you and to decide

12     upon a sentence that's fair and just and reasonable and

13     also not greater than necessary to serve the purposes of

14     sentencing that I just talked about.

15          So you've heard already some of my concerns

16     here.  I have great concern, of course, about what it is

17     you chose to deal in, and it's really the worst of the

18     worst kinds of narcotics nowadays because it kills so many

19     people.  And you did that in the context I think that you

20     were involved or associating yourself with the Latin Kings

21     which is, from all I can tell, just as noxious an

22     organization as they can come.  It gives people maybe

23     false hope of some sort of family relationship or support,

24     but it's a criminal organization as well and engages in

25     violent acts.  I'm glad to see you weren't part of what

1   happened with respect to some of the others who have been

2   charged here in the shooting incident, but it's a violent

3   organization as well.  So you weren't just drug dealing.

4   I think you had also an association or relationship,

5   clearly had one with a very senior person of the

6   Latin King organization.

7           I'm troubled as well, as Mr. Leaming has pointed

8   out, that you keep blowing through kinds of the limits

9   here.  Even after the sentence imposed for this very

10  serious attempt to shoot a police officer and a severe

11  sentence that you got, you're back out and at it again,

12  living at the Broad Street address or spending time there

13  and selling drugs out of there and then arrested for that.

14  Even all those police officers around and doing the search

15  and putting you under arrest again and bringing you back

16  into court again doesn't stop you.  You're back at it

17  again and on the wire by November of 2017 doing more drug

18  dealing, heroin especially.  So that's a real concern for

19  me.

20          I understand Mr. Leaming when he raises all the

21  issues here about you may have good intentions but look at

22  the track record in terms of what's happened.

23          I think, on the other hand, that there are some

24  good things to say about some of the parts of your track

25  record.  The fact that you started employment in those

1    last months before your arrest here.  And that's a good

2    thing.  That's something that didn't seem to be really

3    happening before.  That you have faced your own struggles

4    with drug addiction.  I don't hold it against you the fact

5    that you've gone through programs before and not

6    succeeded.  It's better that you tried to do the program,

7    at least.  I'm not holding that against you.  I just think

8    it should be a signal to you what an enormous challenge

9    it's going to be for you, and you have to be ready to

10   fully accept that.

11          I understand you didn't have the kind of

12   childhood that many or most of us have in terms of the

13   support.  In fact, your mom was the worst of examples in

14   some ways.

15          And I also credit you with the fact that you

16   have a loyal family.  And even since your arrest on the

17   federal charge and when you've been in Wyatt, you clearly,

18   as I can see from everything Ms. Felsen has given me,

19   you've taken part and participated in programs, to your

20   credit.  I'm very hopeful that everything Ms. Felsen says

21   in terms of finally the light going off and saying, hey,

22   enough of this.  I'm really hopeful that that's the case.

23          I think you've demonstrated enough there that

24   I'm -- as much as I find Mr. Leaming's argument for what

25   the sentence I should impose persuasive, I'm not going to

1  impose a sentence quite as severe as he's asking me to do

2  or as high as that because of what you've proved in some

3  ways in terms of what you've done at Wyatt and what you

4  did with getting a job, the way you talked about it today

5  in court.

6           On the other hand, as I look at it, and I look

7  at your request for a sentence that would be below what

8  the Sentencing Guidelines say, I have a hard time with

9  that.  And the reason I have a hard time with it is

10  because of the history there, because of the resort to

11  violence that you had at least ones that I know was a long

12  time ago, but still, and then a killer drug like this.

13  And I have to wonder what does it say to people who are

14  making choices out there about are they going to become a

15  Latin Kings member, are they going to join the

16  Latin Kings, are they going to go out and deal drugs, what

17  that says if I say, well, no, this is somebody who should

18  receive a sentence that's less than what the Sentencing

19  Guidelines suggest.

20           So I'm going to impose a sentence within the

21  Sentencing Guidelines for those reasons.  I know it's a

22  severe one.  But I unfortunately think it's justified from

23  the facts here.

24           So I'm going to ask you to stand at this time,

25  Mr. Vega.

1          Mr. Frankie Vega, for the reasons I've stated,

2     I'm sentencing you to a term of six years of imprisonment.

3     It's a 72-month term of imprisonment.  It's at the lower

4     end of the Sentencing Guidelines range.  It's not a signal

5     that in any way anybody has given up on you.  Everybody is

6     hoping, I'm hoping you're going to turn things around.  It

7     could be quite a bit less if you qualify for the

8     Residential Drug Abuse Program and you go through it,

9     could be significant reduction in that.  I was at federal

10    prison last week and talked to people about those

11    programs, and they told me they're undersubscribed in some

12    quarters now because of how intense it is, how hard it is

13    for people to get through.  So I'm going to make a

14    recommendation that you be part of that program and that

15    will be helpful to you, but I'm going to impose the term

16    of 72 months of imprisonment.

17          It will be followed by a term of three years of

18    supervised release with some conditions I'm going to talk

19    about in a moment.

20          I'm not imposing a criminal fine.  You should be

21    saving your money to support you and your family in your

22    employment.

23          And I'm imposing a $100 special assessment.

24          Now, in terms of conditions of supervised

25    release, I'll impose the so-called standard conditions

1    under Section 5D1.3(c) of the Sentencing Guidelines.  I'll

2    impose the mandatory conditions that you not commit

3    another federal, state, or local offense; that you'll be

4    subject to substance abuse testing, that you not

5    unlawfully possess a controlled substance, that you

6    refrain from any unlawful use of a controlled substance

7    and be subject to a drug test within 15 days of your

8    release and at least two periodic drug tests thereafter,

9    although it will probably be much more than that; and that

10   you'll cooperate in the collection of a DNA sample.

11          And then for the special conditions, I'm going

12   to impose those conditions that I already talked to you

13   about that are set forth in the Presentence Report that

14   you not communicate or otherwise interact with any known

15   member of the Latin Kings gang without first obtaining

16   permission of the Probation Office; that you'll

17   participate in educational and/or vocational services

18   program; that you'll participate in substance abuse

19   treatment, whether it's inpatient or outpatient, as

20   approved by the Court program; and that you'll also, as we

21   discussed, participate in outpatient mental health

22   counseling.

23          So those are the conditions of supervised

24   release.

25          And I'll ask all counsel, is there any reason

1   why the Court cannot lawfully impose this sentence I've

2   imposed, whether or not you agree with it?

3              MR. LEAMING:  No, Your Honor.

4              MS. FELSEN:  No, Your Honor.

5              May I have one moment, please?

6              THE COURT:  Certainly.

7                   (Pause.)

8              MS. FELSEN:  No, Your Honor.

9              THE COURT:  Is there a recommendation for

10  designation?

11             MS. FELSEN:  Yes, Your Honor.

12             I'd like that if the recommendation could be

13  made for Mr. Vega to go to Danbury as long as the RDAP

14  program is available.  And if not, the nearest facility to

15  Connecticut where it is available.

16             THE COURT:  I'll make that recommendation in the

17  judgment.

18             So Mr. Vega, you have the right to appeal under

19  certain circumstances either the conviction and/or the

20  sentence that the Court's imposed.  If you wanted to do

21  that, you'd need to do so within the next 14 days.  And if

22  you wish to appeal, you'd have counsel appointed to

23  represent you.  Do you understand that, sir?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Anything else to take up?

1          MR. LEAMING:  There's some counts to be

2    dismissed, Your Honor.  I think as to Mr. Vega, Count 7,

3    8, 35, 36, and Count 1 as well should be dismissed as they

4    pertain to Mr. Vega.  He pled guilty to Count 8, so

5    obviously that can't be dismissed, but the other counts

6    should be dismissed.

7          THE COURT:  As to the other counts, motion is

8    granted.

9          Thank you.  We'll stand in recess.

10          MS. FELSEN:  Thank you, Your Honor.

11              (Proceedings adjourned at 11:26 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4          RE: UNITED STATES OF AMERICA v. FRANKIE VEGA
                      No. 3:18CV90(JAM)

5

6              I, Diana Huntington, RDR, CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages 1 through 59 are a true and accurate

10   transcription of my shorthand notes taken in the

11   aforementioned matter to the best of my skill and ability.

12

13

14

15

16                  _____/s/_____

17                      DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
18                      United States District Court
                        141 Church Street, Room 147
19                      New Haven, Connecticut 06510
                            (860) 463-3180
20

21

22

23

24

25